COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

UNION MUTUAL INSURANCE COMPANY OF PROVIDENCE, Respondent.

No. 6922.

United States Court of Appeals
First Circuit.

Dec. 5, 1967.

Thomas L. Stapleton, Atty., Dept. of Justice, with whom Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson and Gilbert E. Andrews, Attys., Dept. of Justice, were on brief, for petitioner.

Carl J. Marold, Boston, Mass., with whom James R. Hopkins and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

The Commissioner of Internal Revenue petitions for review of a Tax Court decision which held that the Commissioner erroneously disallowed certain deductions as interest on indebtedness, for the years 1957 through 1962 within the meaning of section 822(c) (5) of the Internal Revenue Code of 1954. The question turns on the nature, for income tax purposes, of semi-annual payments to holders of "Guaranty Fund Certificates" issued by a mutual insurance company to provide a reserve enabling it under state law to write policies free of any contingent liability on the part of the policyholder.

A majority of the Tax Court, after reviewing the authorities which have dealt with this kind of instrument issued by this kind of company, concluded that a debtor-creditor relationship was created by the circumstances of this case. A minority of that court noted that certain elements commonly present in such a relationship (e. g., right to interest irrespective of profits, fixed maturity date for payment of principal, unrestricted transferability) were absent, while an element not ordinarily associated with debt instruments, the right to elect some directors, was recognized by the certificates. They concluded that the precedents cited by the majority were not determinative. We agree with the majority, taking the position that, while the Guaranty Fund Certificates involved in this case may have attributes which evidence both debt and equity interest, they should be construed as the former. While neither ordinary fish (debt) nor fowl (equity), they are, under the circumstances of this case, good red herring.

Respondent, a Rhode Island company, was incorporated under a charter granted by special act of the legislature in 1863. Under this charter, Union Mutual may issue policies without subjecting the holders to the risk of assessment for losses provided that it maintains a guaranty fund and surplus aggregating $300,-000. That this is not a unique requirement is shown by the listing in the

record of this case of 136 mutual companies reporting guaranty funds. Respondent has maintained its Guaranty Fund during the tax years in issue in the amount of $500,000, representing 500 Certificates, in the principal amount of $1,000 each, held by some 70 individuals and corporations.

Each certificate acknowledges the receipt of $1,000 and provides for repayment of this amount when the Board of Directors so votes, with the approval of the Rhode Island Insurance Commissioner, so long as the net surplus continues to exceed $500,000. It further provides for semi-annual "interest" of not more than 5 per cent, nor less than 3½ per cent "if the net profits or unused or unabsorbed premiums left after all expenses and losses then incurred, with reserve for reinsurance * * * shall be sufficient to pay the same." It also stipulates that the fund is to be applied to the payment of losses only when the company has exhausted its assets, including the liability of its members, but exclusive of uncollected premiums; and it describes preconditions to transfer, involving appraisal and offer to a certificate holder or policyholder named by the company. In addition to these certificate provisions, the charter directs that the certificate holders shall elect one half of the respondent's directors, the remaining half to be chosen by policyholders.

During each of the tax years in question respondent paid its certificate holders 7 per cent, or $35,000, deducting this sum as interest. During two of these years the payment was made despite the existence of losses. While the sums involved in this case are not large in an absolute sense, the effect of the disallowance of the deductions would be to increase respondent's income tax for the six year period by approximately 60 per cent.

Before reviewing the pertinent authorities, it may be well to examine the problem of financing which faces respondent and others similarly situated. To commence its operations successfully Union Mutual had to attract members, and to do that it had to be able to relieve them of any risk of assessment to meet losses. Therefore, as a practical matter, it had to provide the reserve envisaged by its charter. But it could not sell common stock and remain a mutual insurance company. Nor could it safely have attempted to sell preferred stock. See Commissioner of Internal Revenue v. National Grange Mut. Liability Co., 80 F.2d 316, 318 (1st Cir. 1935). Apart from running the risk of becoming a stock company, it would find itself in the anomalous position of issuing stock even though its charter authority is limited to the issuance of guaranty fund certificates which are characterized in the charter provision governing liquidation as "liabilities". If there was doubt whether respondent could issue preferred stock, this was at least pragmatically resolved in 1955 when one of respondent's substantial certificate holders, Appalachian Insurance Company, was disallowed a dividend credit based on its receipt of the yearly 7 per cent payment, the Internal Revenue Service having reclassified the income from "dividend" to "interest".[1]

Consequently respondent was left with the alternative of raising its fund by borrowing. But, since the charter provision exempted policies from assessment only if and so long as a surplus (or

1. Even now the Commissioner is clear only that the payments are not interest. He is not arguing that they are dividends. In his brief counsel states:

"Guaranty fund certificates, such as those involved here, are not preferred stock; they are a special kind of equity interest used with some frequency in the mutual insurance company industry.[11]

\* \* \* \* \*

"11. While the certificates might fairly be said to represent an interest similar to preferred stock with the payments analogous to dividends in a stock corporation context, this point would be relevant here only by analogy since we are dealing with a different form of business organization, i. e., a mutual insurance company does not have common stockholders."

guaranty fund and surplus together) exceeded all liabilities, including premium and loss reserves, by $300,000, respondent could not at the time of issuance of the certificates safely establish a fixed maturity date and schedule of amortization. It did undertake to pay semi-annual "interest" between specified ranges. While this obligation was not stated to be cumulative, it has been honored even in loss years and has never had to be put to the test. There is nothing in the charter ranking the guaranty fund certificates either below or with other liabilities. Admittedly there is no maturity date and there is the charter-based right to elect half the directors.

To the extent that experience as well as logic may give life to the law, we think that it should in such a case as this. That is, we think that the experience of the mutual insurance industry and of the courts dealing with it has far more to teach than an abstract color matching exercise involving instruments serving quite different purposes. We begin a hundred years ago with Commonwealth v. Berkshire Life Ins. Co., 98 Mass. 25 (1867), where the Massachusetts Supreme Judicial Court refused to subject a mutual insurance company, having guarantee capital stock entitling the holder to 7 per cent annual dividends, to a tax imposed on corporations having "a capital stock divided into shares". The court characterized the fund as "a liability rather than a part of the assets * * *. [T]he shares do not, as in stock corporations, represent aliquot fractional interests in the property and franchise." 98 Mass. at 28–29.

The past three decades have seen various assaults upon the status of mutual insurance companies and the deductibility of payments to suppliers of their guaranty funds. Most of these have been repulsed, the courts seizing upon one or another distinguishing feature. In Commissioner of Internal Revenue v. National Grange Mut. Liability Co., supra, we dealt with a guaranty fund paying cumulative interest, where certificate holders had no right to vote, but did have priority in liquidation over policyholders to the extent of principal and unpaid interest. Notwithstanding that the guaranty fund certificates had replaced preferred stock and were redeemable at a premium, that there was no fixed time for the payment of principal and no express provision for the cumulation of interest, and that the certificate holders had only substantially the same rights on liquidation as had been given to the preferred stockholders, we said, "The requirements of the situation compelled [the backers] to put the company's obligation to the lenders into a tenuous and unusual form. But the essential character of the obligation, i. e., to repay borrowed money, was not changed." 80 F.2d at 320.

Subsequent cases have involved varying patterns of fact with no single discernible and broadly acknowledged litmus test: Manhattan Mut. Life Ins. Co., 37 B.T.A. 1041 (1938) (annual interest of 6 per cent "guaranteed"; no maturity date; held: payments deductible as interest); Benjamin Franklin Life Assurance Co., 46 B.T.A. 616 (1942) (principal and interest payable only out of surplus; no maturity date; priority in liquidation over general creditors; held: payments deductible as interest); Holyoke Mut. Fire Ins. Co., 28 T.C. 112 (1957) (cumulative "dividends"; right to elect half the directors whose function "is analogous in some respects to creditors' representatives"; no maturity date; held: guaranty capital is not stock and company has not lost its mutual status); Property Owners Mut. Ins. Co., 28 T.C. 1007 (1957) (no maturity date; interest arguably cumulative; right of certificate holders to vote; held: company had not lost its mutual status because of nature of its guaranty fund); Citizens Fund Mut. Fire Ins. Co., 28 T.C. 1017 (1957) (cumulative interest; no maturity date; right of certificate holders to vote; held: company had not lost mutual status because of nature of guaranty fund).

Of the decisions dealing with mutual insurance companies, we have found only one, Policyholder's Nat'l Life Ins. Co.,

37 B.T.A. 60 (1938), equating the interest of a certificate holder with that of a stockholder. In that case, however, the payment of interest to the holder of a "founder's certificate" was wholly contingent on the judgment of the directors that "the financial condition of the Company shall warrant such payment." This was not enough, the court properly reasoned, to constitute an obligation.

We think that the case at bar falls within the area staked out by the authorities we have cited. Only by assuming, in addition to the clear provisions relating to payment of interest from earnings, the lack of any maturity date, and the right to vote for directors, that the semiannual payment obligation was not cumulative and that the certificate holders are subordinated in liquidation to general creditors, would we have a case containing more equity-like factors than the precedents. We do not feel forced by the record so to assume. Even making these assumptions, however, we do not feel that there is any such magic in those particular indicia which requires a different result in a field so influenced by "the necessary requirements of the mutual insurance business". See Commissioner of Internal Revenue v. Schmoll Fils Assoc., 110 F.2d 611, 613 (2d Cir. 1940). We confess to having the same reluctance to changing the ground rules here that Mr. Justice Holmes enunciated for the Court in dealing with an analogous attack upon the exempt status of a building and loan association in United States v. Cambridge Loan & Bldg. Co., 278 U.S. 55, 49 S.Ct. 39, 73 L.Ed. 180 (1928). Respondent has not donned "a mask to escape taxation" but, had during the tax years in issue "not unreasonably * * * supposed itself exempt." 278 U.S. at 59–60, 49 S.Ct. 39.

We are aware of the jungle of cases inevitably growing out of the perennial attempt to distinguish "interest" from "dividend". See 4A Mertens, Law of Federal Income Taxation § 26.10. But we are not persuaded by the authorities cited to us by appellant. None has wrestled with the problem that mutual insurance companies necessarily must face. They have been concerned for the most part with reorganizations where holders of preferred stock, often in closely held corporations, have exchanged their stock for some kind of debt instrument, see, e. g., Talbot Mills v. Commissioner of Internal Revenue, 146 F.2d 809 (1st Cir. 1944), aff'd sub nom. John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946), or with obvious risk propositions, Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902 (7th Cir. 1959), or with devices to avoid taxation on profits earned from particular activities, Gregg Co. of Del. v. Commissioner of Internal Revenue, 239 F.2d 498 (2d Cir. 1956), cert. denied, 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957).

We are also somewhat negatively impressed by the inaction of the Congress on the deductibility of payments to holders of mutual insurance company guaranty certificates. Counsel at our request have been able to unearth nothing in the reports accompanying the Revenue Act of 1942 (amending the 1939 Internal Revenue Code) or the 1954 Internal Revenue Code specifically addressing this problem. We do not know whether, as respondent argues, the Commissioner's acquiescence in such cases as *Manhattan Mut. Life Ins. Co.*, supra, or *Benjamin Franklin Life Assurance Co.*, supra, precluded legislative attention. But, taking into consideration acquiescence in the clutch of 1957 cases, *Holyoke, Property Owners*, and *Citizens Fund*, supra, together with the comprehensive attention given the taxation of the underwriting income of mutual insurance companies in the Revenue Act of 1962 to put them on the same basis as stock companies, we note the complete absence of mention of guaranty funds as a resource for the payment of losses.[2] Had there been

2. "While a stock insurance company can pay extraordinary losses not only out of its accumulated profits but out of its paid-in capital, a mutual insurance company can pay extraordinary losses only out of retained underwriting income.

deep-seated concern about the disparity of tax treatment between the dividend payment of stock companies and the interest payments of mutuals, we should have thought it might be reflected in either the legislation or the accompanying reports.

While there may be no significance to the inattention of Congress to this problem, we feel no compulsion in the absence of legislative attention to declare that respondent's guaranty certificates exceed the outer limits of what have been permitted in this specialized field to be treated as instruments evidencing debt. We are not apprehensive that by this action we are creating any escape hatch precedent capable of widespread use or abuse, even were such a consideration material.

Affirmed.

---

\* \* \* [T]he tax deferral formula of the bill gives recognition to the mutuals' lack of access to the capital market for funds with which to pay losses." Sen.

Rep. No. 1881, U.S.Code Cong. & Ad. News, 87th Cong., 2d Sess., Vol. 2, p. 3297, 3357-3358.